UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
TRIBOROUGH SCAFFOLDING AND HOISTING SERVICES, INC., SHANGRI-LA ASTORIA, INC., and NEW YORK FAST GENERAL CONTRACTING CORP.,

Plaintiffs,

23-cv-7324 (PKC)

-against-

FINDINGS OF FACT AND CONCLUSIONS OF LAW

SOUTHWEST MARINE AND GENERAL INSURANCE COMPANY and ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY,

Defendants.
-----------------------------------------------------------------x

CASTEL, U.S.D.J.,

In 2018, plaintiffs New York Fast General Contracting Corp. ("NY Fast") and Triborough Scaffolding and Hoisting Services, Inc. ("Triborough") were retained to perform construction work at a property in Long Island City ("the Project") owned by plaintiff Shangri-La Astoria, Inc. ("Shangri-La"). Triborough engaged RHG Manpower, Inc. ("RHG") to perform scaffolding work on the Project. During the course of the work, non-party William Paulino, an employee of RHG, allegedly fell from scaffolding on the construction site and was injured. Paulino commenced an action in New York state court against Shangri-La, NY Fast and Triborough.

At the time of Paulino's accident, RHG was covered by a commercial insurance policy issued by defendant Southwest Marine & General Insurance Company ("Southwest Marine") and a commercial excess liability insurance policy issued by defendant Endurance American Specialty Insurance Company ("Endurance"). Triborough, Shangri-La and NY Fast

claimed that they were "additional insureds" under the policies issued to RHG. Their claim is predicated on an agreement signed by Triborough and RHG in late 2017. After Southwest and Endurance disclaimed coverage, Triborough, Shangri-La and NY Fast commenced this action. They seek a declaration that Southwest and Endurance are required to defend and indemnify them in the state tort action brought by Paulino.

After discovery in this action concluded, the parties each submitted motions for summary judgment. The Court denied the motions, concluding that there was a material issue of fact as to whether the agreement between Triborough and RHG applied to the Project. Triborough Scaffolding & Hoisting Services, Inc. v. Southwest Marine & General Ins. Co., 23-cv-7324 (PKC), 2025 WL 2720790, at *8–9 (S.D.N.Y. Sept. 24, 2025).

The action proceeded to trial to the Court without a jury. The Court finds by a preponderance of the evidence that Triborough, Shangri-La and NY Fast have proven their breach of contract claims against Southwest Marine and Endurance.

These are the Court's Findings of Fact and Conclusions of Law. Rule 52(a)(1), Fed. R. Civ. P.

FINDINGS OF FACT

The Project and the Underlying Paulino Action.

1. Shangri-La owned the property located at 37-21 32nd Street, Long Island City, New York. (Fact Stip.)[1] Shangri-La retained NY Fast to act as a contractor for the Project. (Id.) By contract signed in May 2018, a company named Forest Management retained

[1] Citations to "Fact Stip." are to the Stipulations of Fact and Testimony found in the parties' Joint Pretrial Order. (ECF 77 at 4–5.) The citation to evidence in the course of these findings is for illustrative purposes. It is not necessarily the only evidence that supports a finding. If a finding of fact is incorrectly labelled as a conclusion of law or vice versa, it should be considered under the proper label.

Triborough to provide scaffolding services for the Project. (Id.; Bohrer Decl. ¶ 6.) Triborough, in turn, retained RHG to act as a scaffolding sub-subcontractor. (Fact. Stip.)

2. On October 3, 2018, non-party William Paulino allegedly fell from a scaffold while working as an employee of RHG at the Project. (Id.)

3. Paulino commenced an action in New York state court to recover damages against Triborough, Shangri-La, and NY Fast (the "Underlying Action"). (Fact Stip.; PX F; PX G.) The initial complaint in the Underlying Action named only NY Fast and Shangri-La as defendants. (PX F.) An amended complaint added Triborough as a defendant. (PX G.)

4. In the Underlying Action, NY Fast, Triborough, and Shangri-La asserted third-party claims against RHG, alleging that Paulino was injured as a result of RHG's negligence. (Fact Stip.; PX H; PX I; PX J.)

The Southwest and Endurance Insurance Policies.

5. Southwest Marine issued a Commercial General Insurance Policy number GL201700010874 to RHG for the policy period December 14, 2017, to December 14, 2018 (the "Southwest Policy"). (Fact Stip.; PX U.) The Southwest Policy contains an additional endorsement providing for a per occurrence limit of $2,000,000. (PX DD.)

6. The Southwest Policy contains an endorsement entitled "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization" providing "Commercial General Liability Coverage" for additional insureds. (Fact Stip.; PX U.) The endorsement provides that general liability coverage extends to "[a]ll entities required by written contract to be included as additional insureds but only with respect to operations performed by the Named Insured or on their behalf." (Fact Stip.; PX U.)

7. The Southwest Policy contains an endorsement entitled "Primary and Noncontributory – Other Insurance Condition." (PX U at 95.) The endorsement provides that

"[t]his insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that: (1) The additional insured is a Named Insured under such other insurance; and (2) You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured." (Id.)

8. Endurance issued commercial excess liability policy number ELD30000657300 to RHG for the policy period May 2, 2018 to December 14, 2018 (the "Endurance Policy"). (Fact Stip.; PX V.)

9. The Endurance Policy "follows form" of the Southwest Policy. (Fact Stip.; PX V.) Accordingly, the Endurance Policy incorporates the terms of the Southwest Policy's additional insured endorsements. (Fact Stip.)

10. The Endurance Policy contains an endorsement entitled "Primary Non-Contributory Endorsement" that provides that "[w]hen required by written contract or agreement, the insurance provided by this policy is primary insurance and we will not seek contribution from any other insurance available to the person or organization covered as additional insured hereunder unless the other insurance is provided by a contractor, other than you, for the same operations and job location." (PX V at 37.)

The Triborough-RHG Agreement.

11. In December 2017, RHG and Triborough executed a document entitled "Subcontract Agreement Rider (Contractor/Subcontractor)" (the "Triborough-RHG Agreement"). (Fact Stip.; PX A.) The signature of the President of RHG, Gil Menashe, is dated December 15, 2017. (Fact Stip.; PX A.) The signature of the Vice President of Triborough, Jared Bohrer, is dated December 16, 2017. (Fact Stip.; PX A.) The Triborough-RHG Agreement lists Triborough as the "Contractor" and RHG as the "Subcontractor." (PX A.)

12. The preamble to the Triborough-RHG Agreement states that "[t]he terms and conditions of this Rider shall supersede and govern any inconsistent term found in other parts of the written agreement and other riders between the parties." (PX A.) The terms "written agreement" and "other riders" are not defined in the Triborough-RHG Agreement.

13. The first paragraph of the Triborough-RHG Agreement, entitled "Indemnity," provides that "[i]n consideration of the Contract Agreement, and to the fullest extent permitted by law, the Subcontractor shall defend and shall indemnify, and hold harmless, at Subcontractor's sole expense, the Contractor, all entities the Contractor is required indemnify and hold harmless, the Owner of the property, and the officers, directors, agents, employees, successors and assigns of each of them from and against all liability or claimed liability for bodily injury or death to any person(s), and for any and all property damage or economic damage, including all attorney fees, disbursements and related costs, arising out of or resulting from the Work covered by this Contract Agreement to the extent such Work was performed by or contracted through the Subcontractor or by anyone for whose acts the Subcontractor may be held liable . . . ." (PX A.)

14. The second paragraph of the Triborough-RHG Agreement, entitled "Insurance," provides that "[t]he Subcontractor shall procure and shall maintain until final acceptance of the Work, such insurance as will protect the Contractor, all entities the Contractor is required indemnify and hold harmless, the Owner, and their officers, directors, agents and employees, for claims arising out of or resulting from Subcontractor's Work under this Contract Agreement, whether performed by the Subcontractor, or by anyone directly or indirectly employed by Subcontractor, or by anyone for whose acts Subcontractor may be liable." (PX A.)

15. Paragraph 2.1 of the Triborough-RHG Agreement provides that "[t]he Subcontractor's insurance shall include contractual liability coverage and additional insured coverage for the benefit of the Contractor, Owner and anyone else the Owner is required to name" and that "[t]he insurance required to be carried by the Subcontractor and any Sub-Sub-Contractors shall be PRIMARY AND NON-CONTRIBUTORY." (PX A.)

16. The Triborough-RHG Agreement does not reference any specific project, set forth a scope of work, describe any work, identify a start and end date for any covered work or state the term or duration of the Triborough-RHG Agreement.

17. The capitalized terms "Contract Agreement," "Work," and "Owner" are not defined in the Triborough-RHG Agreement.

18. Paragraph 2.4(a) of the Triborough-RHG Agreement provides that the Subcontractor shall maintain "Commercial General Liability" insurance coverage "with minimum limits of $1,000,000 each occurrence." (PX A.)

19. The template for the Triborough-RHG Agreement was provided by Triborough's insurance broker. (Hallem Decl. ¶ 5; Tr. at 139.) RHG had no role in drafting the agreement. (Menashe Decl. ¶ 6.)

20. The Triborough-RHG Agreement signed in December 2017 was the first indemnification and insurance agreement between Triborough and RHG. (Hallem Decl. ¶ 5.)

21. Prior to execution, Bohrer and Menashe did not discuss which projects the Triborough-RHG Agreement would apply to either by name of project, the year in which it was to occur, e.g., 2017 or 2018, or in any other manner. (Menashe Decl. ¶¶ 10, 12; Tr. at 23–24.)

22. There was no expressed oral understanding concerning the scope of the Triborough-RHG Agreement. (Tr. at 25, 27.) The parties have not produced any other written

document exchanged between the parties that explained the scope of the Triborough-RHG Agreement.

23. Bohrer testified that the Triborough-RHG Agreement is a "master indemnity and insurance agreement" and that it "was a yearly agreement beginning when it was signed in 2017 through the entirety of 2018." (Bohrer Decl. ¶ 3.) According to Bohrer, the Triborough-RHG Agreement "applied to all RHG's work for Triborough at all construction projects in 2018" and covered "projects that Triborough had not been retained to do yet." (Id. ¶¶ 3, 7.)

24. Bohrer testified that "[i]n 2017 and 2018, Triborough did not have RHG sign project-specific contracts because RHG worked for Triborough on many projects and doing individual contracts for each project was not realistically possible given the timing of when scaffolding work needs to be done." (Bohrer Decl. ¶ 4.) When Triborough needed RHG to work on a construction project, Bohrer "would call or text RHG to tell RHG where and when Triborough needed RHG to provide workers." (Id.)

25. As to the Project, Bohrer testified that "Triborough was retained for the project in May of 2018." (Id. ¶ 7.) According to Bohrer, "[t]here was no written document describing RHG's work for Triborough at the project because it was not Triborough and RHG's way of doing business to have project-specific contracts." (Id. ¶ 6.) Further, Bohrer testified that Triborough and RHG did not sign a contract at the time Triborough was retained for the Project "because the Triborough-RHG agreement was already signed and in effect for the year and covered the project." (Id. ¶ 7.)

26. On cross-examination, Bohrer was confronted with testimony from his deposition. At deposition, Bohrer testified that he did not remember whether Triborough used

RHG for projects in 2017 and 2018. (Tr. at 28–29, 90–92 (quoting Bohrer Dep. Tr. at 44–46).) He also testified at his deposition that he did not remember whether the Triborough-RHG Agreement applied for an entire year. (Tr. at 35, 90 (quoting Bohrer Dep. Tr. at 105, 108).) And he also testified at the deposition that Triborough and RHG would enter separate agreements for each project they worked on together. (Tr. at 37, 82–84 (quoting Bohrer Dep. Tr. at 105–08).) As to that final point, he explained at trial that he "misspoke" in his deposition. (Bohrer Decl. ¶ 10.)

27. Bohrer also testified that Triborough's use of an annual master insurance and indemnity agreement with RHG was consistent with its relationships with other subcontractors. He stated that Triborough "used the same process with its other subcontractors that it did with RHG" and "entered into annual agreements instead of using individual agreements for each project where Triborough used a subcontractor." (Id. ¶ 5.) According to Bohrer, "[t]hat way of doing business began before 2018 and continued through when Triborough ceased operations in 2023." (Id.)

28. Bohrer's repeated statements in his deposition that he did not remember basic aspects of Triborough's relationship with RHG and the Triborough-RHG Agreement weaken the import of his trial testimony about the intent of the parties in executing the Triborough-RHG Agreement but do not utterly destroy it. In his deposition, Bohrer testified that he thought it was likely that there existed a contract specifying materials, payments and scope of work for the Project. (Tr. at 76 (quoting Bohrer Dep. Tr. at 112–13).) When asked at trial why he provided this testimony in his deposition, Bohrer then testified that for "certain jobs," he would sign a project-specific contract with a subcontractor. (Tr. at 77–78.)

29. Isabella Hallem, Triborough's bookkeeper at all times relevant to this suit, also testified that "[t]he Triborough-RHG agreement applied to all work performed by RHG for Triborough at all construction projects in 2018, including work done at the project." (Hallem Decl. ¶¶ 1, 4.) Hallem further testified that "Triborough's intent with the Triborough-RHG agreement signed at the end of 2017 was for it to apply to all RHG's work for Triborough in 2018" and that it "was intended to apply on its own without the presence of any other contract." (Id. ¶¶ 4–5.)

30. Hallem also testified that "Triborough would have the subcontractor sign the indemnification and insurance agreement before the subcontractor started working for Triborough." (Hallem Decl. ¶ 2.) Hallem further testified that "Triborough followed the same practice with other subcontractors it used, meaning Triborough would also have its other subcontractors sign annual indemnification and insurance agreements instead of individual contracts for every project" because "getting Triborough's subcontractors to sign project-specific contracts for all [their] projects on short notice would have been impossible." (Id. ¶ 4.) Her testimony is not entirely consistent with the testimony Bohrer provided at trial that Triborough sometimes signed project-specific contracts for certain jobs.

31. The Court credits Hallem's testimony that Triborough's practice was not to allow a subcontractor to proceed with work without an agreement covering insurance and indemnity. As to the particular import and meaning of the terms of the Triborough-RHG Agreement, Hallem's testimony is not entitled to significant weight. At trial, she conceded that it was not her job to negotiate or interpret the terms of agreements with subcontractors and that she had no role in drafting the contracts. (Tr. at 144.) She also testified that she generally does not understand insurance language. (Tr. at 139, 144.) Instead, she testified that it was Bohrer's role

to negotiate the terms of contracts with subcontractors and that she relied on Triborough's insurance broker to supply contract templates. (Tr. at 139, 144–45.) She also testified that she did not herself witness any conversations with RHG about the terms of the Triborough-RHG Agreement. (Tr. at 141–42.)

32. Gil Menashe, the owner and president of RHG through 2020, testified that he understood that the Triborough-RHG Agreement "applied to work that was done by RHG for Triborough for the year of 2017" because it was his "custom and practice over many years in this industry to sign agreements . . . to apply to work done in the current year." (Menashe Decl. ¶¶ 1, 7–8.) Because the Triborough-RHG Agreement was signed in 2017, Menashe testified that he believed that it "applied to work performed in 2017" only and did not think that it applied to 2016 or 2018. (Id. ¶ 9.). At trial, however, Menashe testified that because the Triborough-RHG Agreement did not specify dates to which it applied, he could not be sure "if I signed for 2017, 2018, and maybe even 2016." (Tr. at 170.)

33. Menashe agreed that the Triborough-RHG Agreement was meant to be an annual agreement that applied to all of RHG's work for Triborough over the course of a year. (Tr. at 168–69.) Menashe also testified that he did not remember any instance when Triborough and RHG signed a project-specific agreement. (Tr. at 171.)

34. Bohrer and Menashe testified that RHG would not have been allowed to perform any work for Triborough at the Project or any other construction project without an indemnification and insurance agreement in place. (Bohrer Decl. ¶¶ 7, 10; Tr. at 169.) This was a key point of agreement in the testimony of these witnesses, and the Court finds this testimony credible.

35. Bohrer testified that he has done business with Menashe over a period of fifteen years. (Tr. at 71.)

36. Menashe testified that RHG performed scaffolding work for Triborough between December 16, 2017 and December 31, 2017. (Tr. at 172.)

37. Other than the Triborough-RHG Agreement and a backdated agreement, explained below, no other indemnity and insurance agreements between Triborough and RHG were introduced into evidence.

38. Bohrer testified that "Triborough worked on hundreds of construction projects each year in 2017 and 2018." (Bohrer Decl. ¶ 5.).

39. Other than the Triborough-RHG Agreement, no other indemnity and insurance agreements between Triborough and any of its other subcontractors were introduced into evidence.

40. Menashe's initial claim that the Triborough-RHG Agreement applied only to the projects begun between the dates of execution, December 15 and 16, 2017, and December 31, 2017 (Menashe Decl. ¶ 9) is not credible and was contradicted by his subsequent testimony. (Tr. at 170 (could not say "if I signed for 2017, 2018, and maybe even 2016").)

41. It is implausible that Triborough and RHG would have taken the time and effort to execute an indemnity and insurance agreement that was intended to cover only work performed in the closing days of the month of December 2017, without explicitly so stating in the agreement. It is also implausible that Triborough would have allowed RHG to perform work without an indemnity and insurance agreement.

42. The Court finds by a preponderance of the evidence that the Triborough-RHG Agreement was intended to serve as an annual agreement that applied to all of the projects

that RHG worked on for Triborough from the date of execution, December 15 & 16, 2017 until a subsequent annual agreement was executed. The Court finds by a preponderance of the evidence that the Triborough-RHG Agreement applies to the Project, for which RHG was engaged by Triborough in 2018 and for which there has been a claim by Triborough as additional insured under RHG's policies with Southwest Marine and Endurance for a personal injury claim against Triborough arising from an alleged accident occurring on or about October 3, 2018 in which William Paulino, a RHG employee, claims a loss.

Plaintiffs' Tender for Additional Insured Coverage.

43. On May 23, 2018, Triborough and an entity named 32 Street CM LLC executed an agreement entitled "Subcontract Agreement Rider (Contractor/Subcontractor)" (the "NY Fast-Triborough Agreement"). (PX D.) The NY Fast-Triborough Agreement contains the same insurance and indemnity provisions as the Triborough-RHG Agreement. (Id.) The NY Fast-Triborough Agreement lists NY Fast, Shangri-La and 32 Street CM LLC as "Indemnified Parties and Additional Insureds." (Id.) Thus, Triborough was contractually obligated to indemnify NY Fast and Shangri-La for claims arising out of work performed by Triborough and to obtain insurance coverage for that work naming them as additional insureds.

44. In an August 2, 2019 letter to Southwest and RHG, NY Fast and Shangri-La claimed that they were additional insureds under the policy issued to RHG. (Fact Stip.; PX O.) The tender letter's claim of additional insured coverage relied on the indemnity and insurance provisions in the Triborough-RHG Agreement. (PX O.)

45. On October 25, 2019, Triborough also claimed to be an additional insured under the Southwest Marine and Endurance policies issued to RHG. (Fact Stip.; PX P; DX 2.) The tender letter that Triborough submitted to RHG, Southwest Marine and Endurance also

relied on the indemnity and insurance provisions in the Triborough-RHG Agreement. (PX P; DX 2.)

46. On April 17, 2020, Southwest declined coverage to NY Fast, Shangri-La, and Triborough. (Fact Stip.; PX R; PX S.) Southwest declined coverage because the Triborough-RHG Agreement referred to a "Contract Agreement" but "RHG did not enter into a contract for work with NY Fast or Triborough for the subject premise." (PX R; see also PX S.)

47. On May 7, 2020, NY Fast and Shangri-La claimed that they were additional insureds under the policy issued by Endurance. (PX Q.) Their claim to additional insured coverage relied on the Triborough-RHG Agreement. (Id.)

48. The Court also finds by a preponderance of the evidence that (1) Triborough's agreement with NY Fast and Shangri-La required Triborough to indemnify and name them as additional insureds, and (2) the Triborough-RHG Agreement required RHG to procure and maintain additional insured coverage for "all entities [Triborough] is required indemnify and hold harmless [i.e., NY Fast]" and "the Owner, [i.e., Shangri-La]."

49. The Court finds by a preponderance of the evidence that NY Fast and Shangri-La are entitled to additional insurance coverage under the Southwest Marine and Endurance policies.

The 2019 Flood and the Backdated Agreement.

50. The trial record contains troubling testimony of a deception.

51. Bohrer and Hallem testified that Triborough's office experienced a flood in the summer of 2019. (Bohrer Decl. ¶ 8; Hallem Decl. ¶ 6.) The flood destroyed many of Triborough's documents, which were stored in the basement of Triborough's office. (Bohrer Decl. ¶ 8; Hallem Decl. ¶ 6; Tr. at 118, 155–56.) According to Bohrer and Hallem, they believed

that the Triborough-RHG Agreement was among the documents lost in the flood. (Bohrer Decl. ¶ 9; Hallem Decl. ¶ 6.)

52. On May 1, 2020, two weeks after Southwest denied coverage to Triborough, Shangri-La and NY Fast, Hallem sent an email to Menashe and another RHG employee, Kosta Oleynikov, asking that they sign a backdated subcontract agreement (the "backdated agreement") for Triborough's records. (DX 3; Bohrer Decl. ¶ 9; Hallem Decl. ¶ 6; Menashe Decl. ¶ 15.)

53. The backdated agreement is entitled "Commercial Construction Insurance Requirements - 1/2020 (Tri Borough Scaffolding and Hoisting Inc.)." (DX 3; PX E.) The backdated agreement contained a provision requiring the sub-contractor, identified as RHG, to carry a commercial general liability insurance policy that listed Triborough as an additional insured. (DX 3; PX E.)

54. Below the signature line on the backdated agreement, the signature date was pre-filled as "1/1/2018." (DX 3.) Hallem testified that she inserted the January 1, 2018 date into the backdated agreement because "it was intended to represent the Triborough-RHG agreement." (Hallem Decl. ¶ 6; Tr. at 122–23.) Oleynikov signed the backdated agreement and left the signature date as January 1, 2018.[2] (PX E.)

55. Hallem testified that the purpose of the backdated agreement "was to put into writing, as best Triborough could, the terms of the Triborough-RHG agreement because we at Triborough thought the Triborough-RHG agreement was lost in the flood." (Hallem Decl. ¶ 6.)

[2] The signature for RHG in the backdated agreement is that of "Kosta Oleynik." (PX E.) Although not material to the Court's holding, the Court assumes that Kosta Oleynikov and Kosta Oleynik are the same person.

56. On May 21, 2020, NY Fast and Shangri-La submitted a second tender letter to Southwest Marine claiming to be an additional insured under the Southwest Policy. (DX 4.) That claim to coverage relied on the backdated agreement. (Id.; Lamberti Decl. ¶ 11.) Hallem testified that she did not believe that she sent the backdated agreement to NY Fast. (Tr. at 133–34, 159.) No evidence provided an explanation for how NY Fast came into possession of the backdated agreement.

57. Southwest Marine again denied coverage. (DX 5; Lamberti Decl. ¶ 12.)

58. Bohrer's testimony as to the circumstances of the creation of the backdated agreement was not credible. On cross-examination, he alternatively testified that he could not remember when the backdated agreement was created and that he believed that the backdated agreement was signed in 2018—before the flood—and not in May 2020, as he had testified in his trial declaration. (Tr. at 46, 48–49, 56, 97.)

59. Hallem's testimony as to the backdated agreement also lacked credibility. During cross-examination, Hallem agreed that Triborough must have had the original Triborough-RHG Agreement as of October 2019—after the date of the flood and before the signing of the backdated agreement—because Triborough's attorney used the document in Triborough's tender for additional insured coverage sent to Southwest Marine on October 25, 2019. (Tr. at 137; PX P; DX 2.) Hallem was unable to credibly explain why Triborough needed the backdated agreement in May 2020, when its attorney had the original Triborough-RHG Agreement as of October 2019. (Tr. at 137–38.) She testified that "we really kind of like messed up" and "[w]e d[id]n't really even remember the attorney ha[d] that document." (Tr. at 139.) Although she testified that Triborough's attorney would generally keep documents like the Triborough-RHG Agreement and not return them to Triborough, she was unable to provide a

credible explanation for what prompted her to ask RHG to sign the backdated agreement in May 2020. (Tr. at 161–62.)

60. The deception and creation of a new version of an agreement between Triborough and RHG dated January 1, 2018 is supported by the fact that Triborough's attorney was in possession of a copy of the true Triborough-RHG Agreement, actually executed in December 2017. The attorney had the copy of the true agreement by at least October 25, 2019, when he submitted a letter to Southwest Marine claiming additional insured coverage that attached the authentic Triborough-RHG Agreement. (DX 2.)

61. The parties agree that the backdated agreement does not entitle plaintiffs to additional insured coverage. (ECF 78 at 11 n.2; ECF 79 at 35 n.5.)

62. The Court finds that it is more likely than not that the backdated agreement was prepared in response to Southwest Marine's denial of additional insured coverage in April 2020 and not because of fears that the flood destroyed the Triborough-RHG Agreement.

63. The backdated agreement does not undermine the Court's finding that the true and authentic Triborough-RHG Agreement, i.e., the agreement executed on December 15 & 16, 2017, was a written agreement that contractually obligated RHG to "procure and . . . maintain until final acceptance of the Work, such insurance as will protect the Contractor [i.e., Triborough], all entities the Contractor is required indemnify and hold harmless [i.e., NY Fast], the Owner [i.e. Shangri-La], and their officers, directors, agents and employees, for claims arising out of or resulting from Subcontractor's Work under this Contract Agreement, whether performed by the Subcontractor, or by anyone directly or indirectly employed by Subcontractor, or by anyone for whose acts Subcontractor may be liable." (PX A.)

CONCLUSIONS OF LAW

64. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship.

65. Count One of the Complaint brings a breach of contract claim against Southwest Marine for its refusal to defend and indemnify the plaintiffs. (ECF 1-1.)

66. Count Two of the Complaint brings a breach of contract claim against Endurance for its refusal to indemnify the plaintiffs. (ECF 1-1.)

67. The parties do not dispute that New York law governs. See Bennett v. Sterling Planet, Inc., 546 F. App'x 30, 33 (2d Cir. 2013) (summary order) ("In a diversity case, where the parties have agreed to the application of the forum law–as evidenced by reliance on that law in the parties' briefing, as in this case–their agreement ends the choice-of-law inquiry.").

68. To succeed on a breach of contract claim under New York law, a plaintiff must prove that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." 34-06 73, LLC v. Seneca Ins. Co., 39 N.Y.3d 44, 52 (2022) (citations omitted). At this stage, the parties' only dispute is whether Southwest and Endurance breached the terms of the policies they issued to RHG by disclaiming additional insured coverage to Triborough, Shangri-La and NY Fast based on the Triborough-RHG Agreement.

69. A party claiming insurance coverage bears the burden of proving entitlement to such coverage. Consolidated Edison Co. of New York v. Allstate Ins. Co., 98 N.Y.2d 208, 218 (2002).

70. Under the language of the Southwest Policy endorsement, defendants must provide general liability coverage to "[a]ll entities required by written contract to be included as

additional insureds but only with respect to operations performed by the Named Insured or on their behalf." (PX U.)

71. The Endurance Policy follows form to the Southwest Policy and provides additional insured coverage to any additional insured under the Southwest Policy.

72. As the Court concluded in its Opinion denying the parties' summary judgment motions, the additional insured endorsement to the Southwest Policy potentially provides coverage to Triborough, Shangri-La, and NY Fast if RHG obligated itself to secure such coverage and even if it failed to have them listed in its policy with Southwest Marine and Endurance as "additional insureds." 2025 WL 2720790, at *5. The additional insured provision applies merely if the named insured, RHG, is required by written contract to add an entity as an additional insured; there is no requirement that RHG be in privity of contract with each of the proposed additional insureds or that those proposed additional insureds be listed as such in the Southwest Policy. See Netherlands Ins. Co. v. Endurance Am. Specialty Ins. Co., 157 A.D.3d 468, 468–69 (1st Dep't 2018); Vargas v. City of New York, 158 A.D.3d 523, 524 (1st Dep't 2018); see also Travelers Property Casualty Co. of America v. Harleysville Worcester Ins. Co., 685 F. Supp. 3d 187, 203–04 (S.D.N.Y. 2023) (Failla, J.).

73. Both the Southwest Policy and Endurance Policy provide that additional insured coverage is primary and noncontributory where required by contract. (PX U at 95; PX V at 37.)

74. The Triborough-RHG Agreement provides that "the Subcontractor shall defend and shall indemnify, and hold harmless, at Subcontractor's sole expense, the Contractor, all entities the Contractor is required indemnify and hold harmless, [and] the Owner of the property . . . from and against all liability or claimed liability for bodily injury or death to any

person(s) . . . arising out of or resulting from the Work covered by this Contract Agreement to the extent such Work was performed by or contracted through the Subcontractor . . . ." (PX A.) The Triborough-RHG Agreement also provides that "[t]he Subcontractor shall procure and shall maintain until final acceptance of the Work, such insurance as will protect the Contractor, all entities the Contractor is required indemnify and hold harmless, [and] the Owner, . . . for claims arising out of or resulting from Subcontractor's Work under this Contract Agreement . . . ." (Id.) The Triborough-RHG Agreement provides that the subcontractor's insurance shall be primary and non-contributory. (Id.)

75. Plaintiffs do not need to be specifically named in the Triborough-RHG Agreement to qualify as additional insureds. 2025 WL 2720790, at *8 (citing Gofranullah v. 630 Realty, LLC, 34602/05, 2007 WL 2304746, at *3 (Sup. Ct., Kings County, Aug. 10, 2007)).

76. Triborough is defined as the "Contractor" in the Triborough-RHG Agreement. Shangri-La was the owner of the property where the underlying accident occurred. Triborough signed an agreement that contains the same indemnity and insurance language as the Triborough-RHG Agreement and provides that Triborough will indemnify NY Fast and Shangri-La. (PX D.) When the underlying accident occurred, RHG was working at the Project site. The question of whether Triborough, Shangri-La and NY Fast are additional insureds thus turns on whether the Triborough-RHG Agreement applies to the at-issue Project.

77. For plaintiffs to qualify as additional insureds, the Triborough-RHG Agreement does not need to detail the specifics of a particular job if it is clear that the parties intended for the agreement to apply to all jobs for which Triborough hired RHG as a subcontractor, including the Project. See Rodrigues v. N & S Building Contractors, Inc., 5 N.Y.3d 427, 432 (2005).

78. The Triborough-RHG Agreement is ambiguous as to whether the "Work under this Contract Agreement" refers to a particular project or proposal between the signatories or if the agreement applied to multiple projects. 2025 WL 2720790, at *7.

79. When a contract is "facially ambiguous, the District Court may consider any evidence that is probative of the parties' intent, including parol evidence." Travelers Property Casualty Co. of America v. Wesco Ins. Co., 585 F. Supp. 3d 463, 472 (S.D.N.Y. 2022) (Caproni, J.) (quoting International Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 87 (2d Cir. 2002)). "If there is ambiguity in the terminology . . . and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such a determination is to be made by the [fact finder]." First Mercury Ins. Co. v. 613 N.Y. Inc., 609 F. App'x 664, 666 (2d Cir. 2015) (summary order) (quoting Hartford Acc. & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 172 (1973)).

80. In considering extrinsic evidence to resolve a contractual ambiguity, a court may consider "negotiations made prior to or contemporaneous with the execution of a written contract" or "industry custom and practice . . . and any relevant course of performance or course of dealing." Volt Electric NYC Corp. v. A.M.E., Inc., 586 F. Supp. 3d 262, 277 (S.D.N.Y. 2022) (Engelmayer, J.) (citations, ellipsis and internal quotation marks omitted) (first quoting U.S. Fire Ins. Co. v. Gen. Reins. Corp., 949 F.2d 569, 571 (2d Cir. 1991); then citing U.S. Naval Inst. v. Charter Commc'ns, Inc., 875 F.2d 1044, 1048–49 (2d Cir. 1989); and then citing Hoyt v. Andreucci, 433 F.3d 320, 332 (2d Cir. 2006)); see also IBJ Schroder Bank & Tr. Co. v. Resolution Tr. Corp., 26 F.3d 370, 374 (2d Cir. 1994) ("[C]ourts have looked to the conduct of the parties in resolving ambiguities in contractual language.").

81. "The district judge as factfinder has considerable discretion in resolving evidentiary inconsistencies." United States v. Delacruz, 862 F.3d 163, 176 (2d Cir. 2017) (quoting United States v. Messina, 806 F.3d 55, 64 (2d Cir. 2015)). "Inconsistency may prompt a factfinder to reject both versions of an account, or to accept one over the other based on a finding that one witness's recollection is more reliable or credible than the other." Id. (quoting Messina, 806 F.3d at 64). "[A] factfinder who determines that a witness has been inaccurate, contradictory and even untruthful in some respects may nevertheless find the witness entirely credible in the essentials of his testimony." Id. (internal quotation marks omitted) (quoting Messina, 806 F.3d at 64).

82. As detailed above, plaintiffs have proven by a preponderance of the evidence that the Triborough-RHG Agreement was intended to apply to all projects that RHG performed for Triborough from the date of execution until a further agreement was reached and therefore included the entirety of 2018.

83. Accordingly, the Court concludes that plaintiffs have met their burden of proving that they are additional insureds under the Southwest Marine and Endurance policies with respect to the Underlying Action. Plaintiffs have shown that Southwest Marine and Endurance are in breach of their respective policies.

84. Thus, plaintiffs have proven their breach of contract claims and are entitled to declaratory relief against the defendants.

85. The Court declares that Triborough, Shangri-La and NY Fast are deemed under New York law to be additional insureds under the Southwest Policy and Endurance Policy for the loss in the Underlying Action and that Southwest Marine must reimburse plaintiffs for all defense costs incurred by them or on their behalf in connection with the Underlying Action.

86. Plaintiffs argue that Southwest Marine must reimburse plaintiffs for all defense costs running from the date of Triborough's October 25, 2019 tender letter to Southwest. (PX P.) See Dynatec Contracting, Inc. v. Burlington Ins. Co., 184 A.D.3d 475, 476 (1st Dep't 2020) (insurer required to "reimburse [plaintiff] for its defense costs in the underlying action since the date of tender."). Southwest Marine did not dispute in its trial brief or post-trial brief that, if it were required to defend plaintiffs as additional insureds, it must reimburse plaintiffs for defense costs incurred after Triborough's October 25, 2019 tender.

87. Accordingly, Southwest Marine must reimburse all costs incurred by Triborough in its defense of the Underlying Action starting from October 25, 2019.

88. New York law requires the award of prejudgment interest at a statutory rate of 9 percent per year on breach of contract claims. N.Y. C.P.L.R. §§ 5001, 5004. "New York law does not permit the trial court to exercise any discretion where a party is entitled to such interest as a matter of right." New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 603 (2d Cir. 2003) (quoting Indu Craft, Inc. v. Bank of Baroda, 87 F.3d 614, 617 (2d Cir. 1996)); see also J. D'Addario & Co. v. Embassy Industries, Inc., 20 N.Y.3d 113, 117 (2012) ("CPLR 5001 (a) mandates the award of interest to verdict in breach of contract actions." (internal quotation marks omitted)).

89. Triborough is entitled to statutory prejudgment interest. (See ECF 1-1 at 9 (requesting that the Court "grant[] such other and further relief as the Court deems proper").)

90. Prejudgment interest "shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." N.Y. C.P.L.R. § 5001(b). "Where such damages were incurred at various times, interest shall be computed upon each item from the date it was

incurred or upon all of the damages from a single reasonable intermediate date." Id. "[W]here damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." Maricultura Del Norte, S. de R.L. de C.V. v. Umami Sustainable Seafood, Inc., 769 F. App'x 44, 53 (2d Cir. 2019) (summary order) (quoting Conway v. Icahn & Co., 16 F.3d 504, 512 (2d Cir. 1994)).

91. Plaintiffs argue that prejudgment interest should be calculated from the date each of Triborough's legal bills were paid. See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Greenwich Ins. Co., 103 A.D.3d 473, 474 (1st Dep't 2013) (awarding "interest from the date [the plaintiff] paid each legal bill"). Defendants have not disputed that such dates are reasonable for the calculation of interest.

92. Therefore, prejudgment interest will be calculated from the dates on which each of Triborough's legal bills were paid.

## CONCLUSION

The Court finds in favor of plaintiffs and against Southwest Marine and Endurance on Counts One and Two of plaintiffs' complaint declaring that (1) Southwest Marine must defend and indemnify plaintiffs as additional insureds on a primary and noncontributory basis in connection with Underlying Action; (2) Southwest Marine must reimburse plaintiffs for all actual and necessary defense costs incurred by them or on their behalf in connection with the Underlying Action; and (3) plaintiffs are covered under the Endurance Policy in connection with the Underlying Action. Plaintiffs shall submit a proposed final judgment with a supporting declaration within seven days.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
October 2, 2026